Present:  All the Justices

SAMAD ORAEE, M.D., ET AL.

v.  Record No. 050206  OPINION BY JUSTICE CYNTHIA D. KINSER
                                    November 4, 2005
HARLIS C. BREEDING, JR.,
EXECUTOR OF THE ESTATE OF
SHERRY E. BREEDING, DECEASED

          FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
                Jonathan C. Thacher, Judge

     In this appeal, we revisit the scope of immunity from

civil liability afforded a physician under Code § 8.01-

581.18(B) and our decision in Auer v. Miller, 270 Va. 172,

613 S.E.2d 421 (2005).  We conclude that the immunity

applies only when a physician fails to review, or take

action in response to the receipt of, a report containing

the results of a laboratory test or examination conducted

"not at the request or with the written authorization of a

physician."  Code § 8.01-581.18(A).  Thus, we will affirm

the judgment of the circuit court refusing to grant

immunity pursuant to Code § 8.01-581.18(B) to a physician

who failed to obtain the results of certain laboratory

tests requested by another physician.  In reaching this

result, we will also overrule our decision in Auer.

                MATERIAL PROCEEDINGS AND FACTS

     The appellee, Harlis C. Breeding Jr., executor of the

estate of Sherry E. Breeding, deceased, filed a medical

malpractice action against Samad Oraee, M.D., and his employer, Samad Oraee M.D., P.C., (collectively, Dr. Oraee). The jury returned a verdict in favor of the plaintiff against Dr. Oraee.[1] In a motion for summary judgment and in motions to strike the plaintiff's evidence both at the close of that evidence and at the conclusion of all the evidence, Dr. Oraee argued that he was immune from civil liability pursuant to Code § 8.01-581.18(B). The circuit court denied the various motions and entered judgment for the plaintiff.

The events precipitating this medical malpractice action commenced on January 3, 2003, when the decedent sought treatment at an emergency room for complaints of facial drooping. Dr. Oraee was called in for a neurology consultation. Because a certain test was not available during the weekend hours at the hospital where the decedent first went, Dr. Oraee transferred her to a different hospital so that she could undergo a test known as a

_____

[1] Breeding also named as defendants Magnus K. Ikhinmwin, M.D., and Mert Kivanc, D.O., along with their respective employers, Northern Virginia Nephrology Associates, P.C., and Mert Kivanc, D.O., P.C. The jury found in favor of the plaintiff against Dr. Kivanc and his employer, but it returned a verdict against the plaintiff in favor of Dr. Ikhinmwin and his employer. The issue in this appeal does not involve these defendants.

magnetic resonance imaging scan (MRI) of her brain.[2]  The MRI revealed that the decedent had suffered a stroke as well as prior strokes on both sides of her brain.  She had not, however, exhibited symptoms of a stroke until she experienced the facial drooping associated with the stroke that caused her to go to the emergency room.

As a result of the MRI and other diagnostic tests, Dr. Oraee ruled out several possible causes for the decedent's strokes.  At that point, he was left with a possible diagnosis of a "clotting disorder" perhaps caused by "antiphospholipid antibody syndrome."[3]  Consequently, Dr. Oraee requested a rheumatology consultation by Dr. Kivanc.

On January 7, 2003, while the decedent was still hospitalized, Dr. Kivanc evaluated the decedent's condition and ordered multiple laboratory tests.  Some of the tests were specifically for the purpose of determining whether the decedent had antiphospholipid antibody syndrome.  Dr.

---

[2] Dr. Ikhinmwin was listed as the decedent's attending physician at the second hospital.

[3] According to one expert witness who testified at trial, the term "antiphospholipid antibody syndrome" means "a syndrome of probably several different causes in which the body inappropriately makes antibodies or has other derangements, abnormalities in the clotting system that makes it more likely for [a person] to have clots." Another expert witness characterized it as "a hyper coagulable state, which means that patients have excessive clotting and form small thrombi or little clots characteristically in both veins and arteries."

Oraee knew that Dr. Kivanc had seen the decedent and had ordered those particular blood tests. Dr. Oraee also knew that it would take five to ten days for the results of the tests to be available.

The next day, January 8, Dr. Oraee discharged the decedent from the hospital and told her to follow up with him as an outpatient. An appointment was scheduled for the decedent to come to Dr. Oraee's office on January 22. Because the decedent's daughter called Dr. Oraee's office and reported that her mother was not feeling well, the appointment was changed to January 17. At that appointment, Dr. Oraee knew that the clotting disorder was still being considered as the cause of the decedent's strokes, but he did not take any action to obtain the results of the blood tests that had been outstanding at the time of the decedent's discharge from the hospital. The results of the tests, which were available on January 13, confirmed that the decedent had antiphospholipid antibody syndrome. Instead, Dr. Oraee discontinued one of the two antiplatelet medications that had been prescribed at the time of her discharge from the hospital and reported to her primary care physician that the decedent was "much better."

On January 29, the decedent was again admitted to a hospital, having suffered "a second massive stroke."

4

During that admission, the diagnosis of antiphospholipid antibody syndrome was again confirmed, and the decedent, for the first time, was placed on anticoagulant medication. As a result of that stroke, the decedent died on March 12, 2003.

During the trial of this action, two doctors testified as expert witnesses for the plaintiff with regard to the allegations against Dr. Oraee. Both witnesses concluded that the decedent had antiphospholipid antibody syndrome and that she should have been placed on anticoagulant medication, as opposed to antiplatelet medication, no later than January 17 when Dr. Oraee saw her in his office following her discharge from the hospital. Both experts also opined that, if the decedent had been placed on anticoagulant medication on January 17, she would not have suffered the subsequent massive stroke on January 29 and would still be alive.

With regard to the question whether Dr. Oraee breached the applicable standard of care, one of the witnesses, Dr. Bruce T. Adornato, testifying as an expert in the field of neurology, opined that, subsequent to the decedent's discharge from the hospital and the laboratory test results becoming available, the standard of care required Dr. Oraee to inquire about and obtain the results of the tests. This

5

is so because the results were abnormal and had implications for the decedent's treatment.  Dr. Adornato further testified that the standard of care required Dr. Oraee to offer the decedent the opportunity to be treated with anticoagulant medication, "i.e., Coumadin rather than just aspirin."  During cross-examination, Dr. Adornato agreed that Dr. Oraee's treatment of the decedent did not fall below the applicable standard of care until January 17, when Dr. Oraee should have diagnosed antiphospholipid antibody syndrome and offered the decedent appropriate treatment.  But, as Dr. Adornato explained, Dr. Oraee could not have made the correct diagnosis without the results of the laboratory tests.

The other witness, Dr. Lee Levitt, an expert in the fields of hematology and medical oncology, testified similarly.  Dr. Levitt opined that, at the time of the decedent's follow-up visit on January 17, Dr. Oraee breached the standard of care by not being aware of the results of the laboratory tests, which would have made "a clear difference in her diagnosis and in management."  As Dr. Levitt explained, Dr. Oraee was involved in the request for a consultation by a rheumatologist, the appropriate laboratory tests were requested to make a diagnosis of

antipholipid antibody syndrome, those tests were performed, and the results were available.

ANALYSIS

The sole question in this case is whether the circuit court erred in refusing to grant Dr. Oraee immunity from civil liability pursuant to the provisions of Code § 8.01-581.18(B).  The question is one of law, meaning that we review the circuit court's resolution of it de novo. Davenport v. Little-Bowser, 269 Va. 546, 552, 611 S.E.2d 366, 369 (2005).  The statute at issue states:

> Any physician shall be immune from civil liability for any failure to review, or to take any action in response to the receipt of, any report of the results of any laboratory test or other examination of the physical or mental condition of any person, which test or examination such physician neither requested nor authorized in writing, unless such report is provided directly to the physician by the person so examined or tested with a request for consultation or by the State Department of Health.

Code § 8.01-581.18(B).

As both parties recognize, answering the question raised in this appeal implicates our recent decision in Auer.  There, the trial court granted immunity under Code § 8.01-581.18(B) to a defendant doctor, Nicolas Auer's cardiologist, for his alleged failure to review or to take any action in response to the results of a laboratory test

7

ordered by a cardiovascular surgeon during Auer's hospitalization. <u>Auer</u>, 270 Va. at 175, 613 S.E.2d at 422. Auer had undergone surgery to remove his native aortic valve and to replace it with a prosthetic valve. <u>Id.</u> at 175-76, 613 S.E.2d at 423. The surgeon had ordered a culture and sensitivity test on the native valve, and the results of the test were positive for staphylococcus. <u>Id.</u> at 176, 613 S.E.2d at 423. The cardiologist saw Auer several times during the hospitalization and prepared a discharge summary, but he never reviewed the report of the test results even though the report had been posted to Auer's chart. <u>Id.</u> The surgeon likewise failed to review the report. <u>Id.</u> Consequently, the infection remained untreated, and Auer subsequently died from endocarditis. <u>Id.</u>

On appeal, we affirmed the trial court's judgment. <u>Id.</u> at 179, 613 S.E.2d at 423. We found "the language of subsection B of Code § 8.01-581.18 to be clear and unambiguous" and stated that this subsection

> clearly provides that a physician shall be immune from civil liability for any failure to take any action in response to a laboratory test or other examination that the physician did not request or authorize unless the person tested or examined provides a copy of the report of the results and requests a consultation.

8

Id. at 177, 613 S.E.2d at 423. We concluded that Code § 8.01-581.18(B) applied to the cardiologist because he "neither requested nor authorized" the culture and sensitivity test and Auer did not provide him with the report of the test results and request a consultation. Id. at 177, 613 S.E.2d at 424.

Dr. Oraee argues that, since the allegations concerning his breach of the standard of care were confined to his failure to obtain the results of the blood tests ordered by Dr. Kivanc and to respond with appropriate treatment, our holding in Auer is dispositive of the question presented in this case. Dr. Oraee further points out that there is no evidence that the decedent provided the results of those blood tests to him with a request for consultation. Thus, in Dr. Oraee's view, "all the elements for granting immunity were in place and [the plaintiff] offered no other theory of liability against [him] independent of the test results."

Responding, the plaintiff asserts that Auer is factually distinguishable from the present case and thus not controlling. The plaintiff points out that the cardiologist in Auer did not know about the culture and sensitivity test ordered by the cardiovascular surgeon and was not involved in the decision to order that test. Id.

9

at 176, 613 S.E.2d at 423.  Continuing, the plaintiff emphasizes that Dr. Oraee, unlike Auer's cardiologist, made a possible diagnosis of antiphospholipid antibody syndrome and consequently requested the rheumatology consultation; he knew that Dr. Kivanc had ordered specific blood tests to determine whether the decedent had this clotting disorder; he knew at the time of the plaintiff's discharge from the hospital that the results of the test would not be available for five to ten days; and he scheduled a follow-up appointment for the decedent.  In the plaintiff's words, "[s]imply because [Dr. Oraee] failed to sign the slip for the lab work does not mean that he did not authorize or intend for the lab work to be completed, thus making [Code § 8.01-581.18(B)], and Auer, inapposite."  The plaintiff also claims that Dr. Oraee's overall breach of the standard of care was his failure to properly diagnose and treat the decedent's condition and that it was not merely Dr. Oraee's failure to review and respond to the results of the laboratory tests.

Alternatively, the plaintiff argues that subsection A and subsection B of Code § 8.01-581.18 must be read together and that subsection B cannot be viewed in isolation.  According to the plaintiff, the intent of the statute is to direct the appropriate course of action when

10

an individual, as opposed to a physician, requests a laboratory test or examination. The plaintiff contends the provisions of subsection A require the report of the results of such test or examination to be delivered to the individual who was tested or examined and to state in bold type that the individual has the responsibility to arrange for a consultation with a physician to review the report and interpret the results.

In light of the context in which subsection A applies, the plaintiff further argues that subsection B grants immunity only when a physician fails to review, or take action in response to the receipt of, a report containing the results of a test or examination obtained by an individual on his/her own initiative. In other words, the plaintiff's position is that subsection B does not come into play if the report at issue contains the result of a test or examination requested or authorized by a physician. This interpretation, in the plaintiff's view, is consistent with the language of the statute when read as a whole, including its title "Delivery of results of laboratory tests and other examinations not authorized by physician; immunity of physician." Code § 8.01-581.18.

We do not agree with the plaintiff's position that the present case is factually distinguishable from our decision

in Auer.  Like the cardiologist in Auer, Dr. Oraee failed to review an available and critical report reflecting the results of a laboratory test that another physician had authorized.  In both instances, the report contained information that directly affected the appropriate medical treatment for the patient.  For purposes of deciding the question before us, it does not matter that Dr. Oraee knew about the laboratory tests ordered by Dr. Kivanc.

Nor are we persuaded by the plaintiff's argument that Dr. Oraee implicitly authorized the laboratory tests at issue.  Dr. Oraee's request for the rheumatology consultation after he suspected that the decedent had antiphospholipid antibody syndrome is not the same as requesting laboratory tests.  Likewise, we do not agree with the plaintiff's assertion that the breach of the standard of care at issue was something more than Dr. Oraee's failure to review and take appropriate action in response to the report of the laboratory test results.

Thus, we turn to the plaintiff's argument regarding the proper interpretation of Code § 8.01-581.18.  To adopt the plaintiff's position would require that we overrule our decision in Auer, and he asks us to do so.  Thus, the doctrine of stare decisis is necessarily implicated.

12

> That doctrine plays a significant role in the orderly administration of justice by assuring consistent, predictable, and balanced application of legal principles. And when a court of last resort has established a precedent, after full deliberation upon the issue by the court, the precedent will not be treated lightly or ignored, in the absence of flagrant error or mistake.

Selected Risks Ins. Co. v. Dean, 233 Va. 260, 265, 355 S.E.2d 579, 581 (1987) (citing Kelly v. Trehy, 133 Va. 160, 169, 112 S.E. 757, 760 (1922)); accord Pulliam v. Coastal Emergency Servs. of Richmond, Inc., 257 Va. 1, 10, 509 S.E.2d 307, 312 (1999); Nunnally v. Artis, 254 Va. 247, 252-53, 492 S.E.2d 126, 128-29 (1997). The question, then, is whether our decision in Auer was a "flagrant error or mistake." Selected Risks, 233 Va. at 265, 355 S.E.2d at 581.

In Auer, we did not expressly address the argument that, when subsection B is read in light of subsection A, the immunity granted in subsection B is available only when the report at issue is one generated as a result of an individual's request, as opposed to a physician's request or written authorization, for a laboratory test or examination. Instead, we focused solely on the provisions of subsection B in reaching our decision.

However, we have a duty, whenever possible, "to interpret the several parts of a statute as a consistent

13

and harmonious whole so as to effectuate the legislative goal." Virginia Elec. & Power Co. v. Board of County Supervisors of Prince William County, 226 Va. 382, 387-88 309 S.E.2d 308, 311 (1983). Generally, the Court "will look to the whole body of [a statute] to determine the true intention of each part." McDaniel v. Commonwealth, 199 Va. 287, 292, 99 S.E.2d 623, 627 (1957); accord Rockingham Coop. Farm Bureau, Inc. v. City of Harrisonburg, 171 Va. 339, 344, 198 S.E. 908, 910 (1938). "[A] statute should be read and considered as a whole, and the language of a statute should be examined in its entirety to determine the intent of the General Assembly from the words contained in the statute." Department of Medical Assistance Servs. v. Beverly Healthcare of Fredericksburg, 268 Va. 278, 285, 601 S.E.2d 604, 607-08 (2004). "In doing so, the various parts of the statute should be harmonized so that, if practicable, each is given a sensible and intelligent effect." Colchester Towne Condominium Council of Co-Owners v. Wachovia Bank, N.A., 266 Va. 46, 51, 581 S.E.2d 201, 203 (2003) (citing VEPCO v. Prince William Co., 226 Va. 382, 387-88, 309 S.E.2d 308, 311 (1983)).

Applying these principles requires subsection B of Code § 8.01-581.18 to be construed together with subsection A. As the plaintiff argues, subsection A pertains only to

14

a laboratory test or examination conducted "not at the request or with the written authorization of a physician." Code § 8.01-581.18(A). For example, subsection A is applicable when a person elects, on his/her own initiative, to be tested for a sexually transmitted disease. In other words, the testing would not be done at the request of or with written authorization from a physician. In that situation, the report stating the results of the test would be provided directly to the person who was the subject of the test. Id. The individual tested would then have the responsibility to arrange for a consultation with a physician about the test results. Id. The report itself would have to state this responsibility in bold type. Id.

With that understanding of subsection A, it then follows that the immunity from civil liability granted in subsection B applies only when a physician is charged with failing to review, or take action in response to receiving, a report of the results of a laboratory test or examination conducted "not at the request or with the written authorization of a physician." Code § 8.01-581.18(A). The immunity granted in subsection B in essence follows the report described in subsection A. Subsection B insulates from civil liability any physician who fails to review that report or to take any action in response to receiving it.

That immunity, however, is not available if "such report is provided directly to the physician by the person so examined or tested with a request for consultation." Code § 8.01-581.18(B). The circumstance eliminating a physician's immunity in subsection B corresponds to the provision in subsection A requiring a report of a laboratory test or examination "conducted . . . not at the request or with the written authorization of a physician" to be provided directly to the person tested or examined. Code § 8.01-581.18(A). That common requirement reflects the General Assembly's intent that these two subsections be "considered as a whole." Department of Medical Assistance Servs., 268 Va. at 285, 601 S.E.2d at 607. Overall, the provisions of Code § 8.01-581.18, create a mechanism for handling reports of the results of laboratory tests or examinations requested by an individual rather than by a physician. The statute does not pertain to reports of laboratory tests or examinations requested or authorized by a physician.

To grant Dr. Oraee immunity under Code § 8.01-581.18(B) would lead to consequences the General Assembly could not have intended. Assume that a physician orders a blood test that preliminarily suggests the need for surgery, and the physician then refers the patient to a

16

surgeon.  Assume further that the final report of the blood test results demonstrates that surgery is not necessary, but the surgeon never reviews the final report and proceeds with surgery.  Under Dr. Oraee's interpretation of subsection B and our decision in Auer, the surgeon would be immune from civil liability for breaching the standard of care merely because he did not personally request or authorize the blood test.  Furthermore, since the patient in this hypothetical did not request the blood test, the patient would not receive the report with the warning in bold type that is it the patient's responsibility to arrange for consultation with a physician about the report.

Thus, we conclude that our decision in Auer was a mistake.  While we adhere strongly to the doctrine of stare decisis in this Commonwealth, this is one of those rare situations in which we cannot perpetuate a clearly incorrect application of the law.  See Nunnally, 254 Va. at 253, 492 S.E.2d at 129.  It is "this Court's obligation to reexamine critically its precedent" and, by doing so, "confidence in the judiciary" and "the importance of stare decisis in our jurisprudence" will be enhanced.  Id.

### CONCLUSION

The doctrine [of stare decisis] grows out of
the necessity for a uniform and settled rule of
property, and definite basis for contracts and

17

business transactions. If a decision is wrong, it is only when it has been so long the rule of action as that time and its continued application, as the rule of right between parties, demand the sanction of its error; because when a decision has been recognized as the law of property, and conflicting demands have been adjusted, and contracts have been made with reference to and on the faith of it, greater injustice would be done to individuals, and more injury result to society by a reversal of such decision, though erroneous, than to follow and observe it. But when a decision is not of this character, upon no sound principle do we feel at liberty to perpetuate an error into which either our predecessors or ourselves may have inadvertently fallen, merely upon the ground of such erroneous decision having been previously rendered.

Burks v. Hinton, 77 Va. 1, 24-25 (1883) (quoting Willis v. Owen, 43 Tex. 41, 48-49 (1875)).

To reaffirm our decision in Auer would perpetuate a mistake. Thus, the holding in Auer pertaining to Code § 8.01-581.18(B) is expressly overruled. Accordingly, we conclude that the circuit court did not err in refusing to grant immunity to Dr. Oraee under the provisions of Code § 8.01-581.18(B), nor did it err in denying Dr. Oraee's various motions and jury instruction dealing with this statutory provision. For these reasons, we will affirm the judgment of the circuit court.

Affirmed.

JUSTICE AGEE, with whom JUSTICE KEENAN and JUSTICE KOONTZ join, dissenting.

18

The majority overrules our recent decision in Auer v. Miller, 270 Va. 172, 613 S.E.2d 421 (2005), interpreting Code § 8.01-581.18(B), by finding that decision to be a "mistake."  In doing so, the majority holds that subsection A of Code § 8.01-581.18 restricts the application of the immunity provision of subsection B to only those laboratory tests described in subsection A.  I believe subsection B clearly provides otherwise and therefore our analysis of Code § 8.01-581.18 in Auer correctly applied the statute and was not in error.  Further, I also believe the majority fails to properly observe the long-standing role of the doctrine of stare decisis by overruling Auer.

## I.  STARE DECISIS

It is a bedrock foundation of our jurisprudence that prior decisions of this Court are entitled to respect and deference under the doctrine of stare decisis.  The doctrine is foundational because

> in a well ordered society it is important for people to know what their legal rights are, not only under constitutions and legislative enactments but also as defined by judicial precedent, and when they have conducted their affairs in reliance thereon they ought not to have their rights swept away by judicial decree . . . .

Myers v. Moore, 204 Va. 409, 413, 131 S.E.2d 414, 417 (1963).

Heralded as "one of the most important principles in the structure of our law," stare decisis entails more than a passing reference or fleeting mention.  Id.; see also Selected Risks Ins. Co. v. Dean, 233 Va. 260, 265, 355 S.E.2d 579, 581 (1987).  As this Court has stated,

> [stare decisis] plays a significant role in the orderly administration of justice by assuring consistent, predictable, and balanced application of legal principles.  And when a court of last resort has established a precedent, after full deliberation upon the issue by the court, the precedent will not be treated lightly or ignored, in the absence of flagrant error or mistake.

Selected Risks, 233 Va. at 265, 355 S.E.2d at 581.

In my view, the majority has failed to articulate a compelling argument that the unanimous opinion of this Court in Auer was of such a degree of error that stare decisis can be cast aside.  Reversing a prior opinion of this court, particularly where the grounds to do so are so open to question, lessens the value of stare decisis for our jurisprudence as a whole.  See Newman v. Erie Ins. Exch., 256 Va. 501, 510-11, 507 S.E.2d 348, 353 (1998) (Compton, J., dissenting) ("Frequent overruling of an appellate court's decisions tends to bring adjudications of the tribunal 'into the same class as a restricted railroad ticket, good for this day and train only.' ").

II.  CODE § 8.01-581.18

Code § 8.01-581.18 provides as follows:

A. Whenever a laboratory test or other examination of the physical or mental condition of any person is conducted by or under the supervision of a person other than a physician and not at the request or with the written authorization of a physician, any report of the results of such test or examination shall be provided by the person conducting such test or examination to the person who was the subject of such test or examination. Such report shall state in bold type that it is the responsibility of the recipient to arrange with his physician for consultation and interpretation of the results of such test or examination. The provisions of this subsection shall not apply to any test or examination conducted under the auspices of the State Department of Health.

B. Any physician shall be immune from civil liability for any failure to review, or to take any action in response to the receipt of, any report of the results of any laboratory test or other examination of the physical or mental condition of any person, which test or examination such physician neither requested nor authorized in writing, unless such report is provided directly to the physician by the person so examined or tested with a request for consultation or by the State Department of Health.[4]

The majority maintains that Auer was in error because it failed to read subsection B "in light of subsection A." The majority opines that because subsection B follows subsection A, "[t]he immunity granted in subsection B in essence follows the report [prepared by a non-physician] described in subsection A." The majority partly bases its

_____

[4] Code § 8.01-581.18(C) is omitted as it has no bearing on any issues before the Court.

21

holding on the view that since subsection B follows subsection A in the statute, the later subsection should be read only as referencing the first subsection.  I am aware of no rule of statutory construction which directs such a reading, and the majority cites none.  We have not held that a statutory subsection must be read solely in reference to the subsection it follows; rather, we are always guided by the plain language of the statute as the General Assembly has written it.

As noted below, neither subsection A nor B of Code § 8.01-581.18 are ambiguous.  The plain language of each subsection establishes a legal duty or action wholly independent of the other.  Further, the plain language of subsection B establishes physician immunity for certain laboratory tests which is not dependent upon or circumscribed in any way by the provisions of subsection A. The General Assembly knows how to write subsection B as the majority construes that subsection, but it did not do so.

Our duty is "to construe the law as it is written." Hampton Roads Sanitation Dist. Comm'n v. City of Chesapeake, 218 Va. 696, 702, 240 S.E.2d 819, 823 (1978). "To depart from the meaning expressed by the words is to alter the statute, to legislate and not to interpret."

22

Faulkner v. Town of South Boston, 141 Va. 517, 524, 127
S.E. 380, 382 (1925).  Thus,

> [w]e presume that the legislature chose,
> with care, the words it used when it enacted the
> statute. Courts cannot add language to the
> statute the General Assembly has not seen fit to
> include. Nor are they permitted to accomplish the
> same result by judicial interpretation. Where the
> General Assembly has expressed its intent in
> clear and unequivocal terms, it is not the
> province of the judiciary to add words to the
> statute or alter its plain meaning.

Jackson v. Fidelity & Deposit Co., 269 Va. 303, 313, 608
S.E.2d 901, 906 (2005) (citations and internal quotation
marks omitted).

As the majority opinion accurately recites, Code
§ 8.01-581.18(A) provides that the results of a laboratory
test made "not at the request or with the written
authorization of a physician" shall be provided "to the
person who was the subject of that test."  Further,
subsection A mandates that it is solely the recipient's
responsibility to arrange for any "such test" to be
reviewed by a physician.  The plain language of subsection
A does not address any other subject.  There is no
ambiguity in subsection A and the majority cites none.
Thus, subsection A fulfills a distinct and independent
purpose to direct the result of non-physician ordered
laboratory tests to the subject of the test and to place

23

responsibility solely on that person for any further review.  Subsection A thus sets forth a substantive provision of law in and of itself.

Subsection A of Code § 8.01-581.18 makes no reference to subsection B or to immunity of physicians in any way. Importantly, neither does subsection B make reference to subsection A.

Subsection B plainly provides, as we noted in Auer, that "[a]ny physician shall be immune from civil liability for any failure to review . . . any report of the results of any laboratory test . . . which test . . . such physician neither requested nor authorized in writing." Code § 8.01-581.18(B)(emphasis added).  Nothing in the straightforward language of subsection B limits the scope of its granted immunity only to tests described in subsection A.  There is no ambiguity in subsection B, and the majority cites none.  Instead, subsection B provides exactly for what the General Assembly wrote: immunity for physicians from liability for failure to review any laboratory test the physician did not order or authorize. As in the case at bar and Auer, that immunity encompasses laboratory tests ordered by physicians other than the defendant physician.

24

Subsection B thus sets forth a substantive provision of law in and of itself. It fulfills a distinct and independent purpose, wholly different from that of subsection A, by granting immunity to any physician regarding any laboratory test the physician "neither requested nor authorized in writing." Code § 8.01-581.18(B). While, a fortiori, this would include a laboratory test ordered by a non-physician under subsection A, absolutely nothing in Code § 8.01-581.18 limits the application of subsection B physician immunity to only subsection A non-physician ordered tests. The plain language of the statute means what it says, and we have no authority to rewrite the statute by judicial decision. Burlile v. Commonwealth, 261 Va. 501, 511, 544 S.E.2d 360, 365 (2001).

Although the language of Code § 8.01-581.18 is plain, the majority nevertheless maintains that subsection A's limitation to tests administered by non-physicians should be read into subsection B in order to construe those provisions together as a "consistent and harmonious whole." But nothing in Auer's construction of Code § 8.01-581.18(B) creates an inconsistency within the statute. There is no requirement that two sections of the same statute be interdependent unless the statute so provides by its terms,

25

and Code § 8.01-581.18 does not.  Acknowledging subsection B to have a meaning separate, distinct and independent from subsection A does not create an inconsistent statute.  As noted above, each subsection has a particular purpose independent and free standing of the other under the plain language of the statute.

Subsection A simply directs a laboratory to send the test results of a non-physician ordered test to the subject of that test and imposes responsibility upon that person to arrange for any physician review.  Separate and distinct from this function, subsection B provides physician immunity from "<u>any</u> failure to review . . . <u>any</u> report . . . of <u>any</u> laboratory test . . . which test . . . such physician neither requested nor authorized in writing." (Emphasis added).  While related, each subsection has a distinct and independent focus and stands alone without need of the other in establishing a substantive legal requirement.

The majority's contention that the language in subsection B which limits physician immunity where a laboratory "report is provided directly to the physician by the person so examined" somehow limits subsection B immunity only to subsection A tests is erroneous.  As fully discussed above, the plain language of subsection B

26

immunity encompasses <u>any</u> test not ordered by the physician. The fact that subsection B immunity is restricted where the patient delivers a copy of his laboratory test to the physician cannot be read as circumscribing immunity only to those subsection A tests.  This is so because "any" report includes not only those subsection A tests of the patient which that patient or other non-physician ordered and delivers to the physician, but also tests ordered by another physician which the patient delivers.  Thus, the language in subsection B cannot be read as the majority concludes to limit subsection B immunity to only subsection A laboratory tests.

It is not uncommon for the General Assembly to draft a statute which contains independent, though related provisions, and this Court has repeatedly recognized that successive provisions of a statute may function separately.  In <u>Greenberg v. Commonwealth</u>, 255 Va. 594, 597, 499 S.E.2d 266, 267-68 (1998), we reversed the trial court's judgment imposing personal liability on a check cashing company's majority shareholder for making loans in amounts and at interest rates prohibited by Code § 6.1-249.  Another code provision, Code § 6.1-308, set forth the penalties for violations of Code § 6.1-249 as follows:

A. Any person and the several members, officers, directors, agents, and employees thereof, who violate or participate in the violation of any provision of § 6.1-249 shall be guilty of a Class 2 misdemeanor.

B. Any contract of loan in the making or collection of which any act has been done which violates § 6.1-249 shall be void and the lender shall not collect, receive, or retain any principal, interest, or charges whatsoever, and any amount paid on account of principal or interest on any such loan shall be recoverable by the person by or for whom payment was made.

Greenberg, 255 Va. at 599, 499 S.E.2d at 269 (emphasis added).

The shareholder in Greenberg argued that he could not be individually liable under Code § 6.1-308(B) because that subsection provided for recovery against only the lender. Id. at 600, 499 S.E.2d at 269. We agreed, noting that though subsection A of that statute provided for individual liability, subsection B did not.

In contrast to subsection (A), Code § 6.1-308(B), provides that only the "lender shall not collect, receive, or retain any principal, interest, or charges whatsoever, and any amount paid on account of principal or interest on any such loan shall be recoverable by the person by or for whom payment was made." (Emphasis added). Absent from subsection (B) is the broad category of entities found in subsection (A). In other words, subsection (B) does not include any individual, officer, director, or entity other than the lender.

Id. 255 Va. at 601, 499 S.E.2d at 270.  We noted that reading the sections of the statutory provision

28

independently was in accordance with the intent of the General Assembly.

> When the General Assembly uses two different terms in the same act, it is presumed to mean two different things. As evident in subsection (A), the General Assembly knew how to broaden the range of liability, and the absence of any such provisions in subsection (B) indicates the General Assembly's intent to limit those from whom borrowers may obtain restitution. To determine otherwise would be to rewrite the statute and to contradict the General Assembly's express intent.

Id. 255 Va. at 601-02, 499 S.E.2d at 270 (citation and internal quotation marks omitted); see also Level 3 Commcn's of Va., Inc. v. State Corp. Comm'n, 268 Va. 471, 476-78, 604 S.E.2d 71, 73-74 (2004) (reading subsections of Code § 56-265.4:4 independently in accordance with the plain language of the statute).

In Halifax Corp. v. First Union Nat'l Bank, 262 Va. 91, 100, 546 S.E.2d 696, 702 (2001), we noted that the duty imposed upon a customer to exercise reasonable promptness to examine a bank statement to determine whether any payment was unauthorized under Code § 8.4-406(c), existed whether or not the bank had paid those items in good faith. We declined to adopt the appellant's argument that the requirement that a bank pay an item in good faith in order to assert a statutory bar against a customer claim under Code § 8.4-406(d) and (e), should be read into the

29

customer's duty to examine his bank statement under Code

§ 8.4-406(c).  Id. at 101, 546 S.E.2d at 702-03.  This

Court specifically noted that "when the General Assembly

includes specific language in one section of a statute, but

omits that language from another section of the statute, we

must presume that the exclusion of the language was

intentional."  Id. at 100, 546 S.E.2d at 702.

To accurately represent the majority's interpretation

of subsection B of Code § 8.01-581.18, the General Assembly

would have written it as follows:

> Any physician shall be immune from civil
> liability for any failure to review, or to take
> any action in response to the receipt of, any
> report of the results of any [such] laboratory
> test [under Subsection A] or other examination of
> the physical or mental condition of any person,
> which test or examination such physician neither
> requested nor authorized in writing . . . .

(Emphasis added.)  The General Assembly, however, did not

include any such limitation.  Clearly, the General Assembly

knew how to reference such non-physician ordered laboratory

tests as it did so specifically five times in subsection A:

> [A]ny report of the results of such test . . .
> shall be provided by the person conducting such
> test . . .to the . . . subject of such test
> . . . .  Such report shall state in bold type
> that it is the responsibility of the recipient to
> arrange with his physician for consultation and
> interpretation of the results of such test or
> examination.

30

Code § 8.01-581.18(A) (emphasis added).  Had the General

Assembly wished to limit the scope of subsection B immunity

to "such" non-physician ordered tests of subsection A, it

could have done so, but it did not.

The General Assembly unquestionably knows how to

connect the various provisions of a statute when it desires

to make them interdependent.  The fact that the Legislature

did not choose to do so in Code § 8.01-581.18 "represents

an unambiguous manifestation of a contrary intention."

Halifax Corp. v. Wachovia Bank, 268 Va. 641, 654, 604

S.E.2d 403, 408; see also Couplin v. Payne, 270 Va. 129,

135-36, 613 S.E.2d 592, 594-95 (2005).  For example, Code

§ 2.2-514(A) empowers the Attorney General to "compromise

and settle disputes . . . involving all interests of the

Commonwealth . . . ."  Subsection B of that statute

provides that "[n]o settlement under subsection A shall be

made subject to a confidentiality agreement that prohibits

the Commonwealth . . .from disclosing the amount of such

settlement."  Code § 2.2-514(B) (emphasis added).

Finally, the majority contends that "grant[ing] Dr.

Oraee immunity under Code § 8.01-581.18(B) would lead to

consequences the General Assembly could not have intended."

What the majority does not recognize is that the

elimination of unintended consequences is a matter for

31

legislative, not judicial, remedy.  We have repeatedly held that

> we determine the General Assembly's intent from the words contained in the statute. When the language of a statute is unambiguous, courts are bound by the plain meaning of that language and may not assign a construction that amounts to holding that the General Assembly did not mean what it actually has stated.

Williams v. Commonwealth, 265 Va. 268, 271, 576 S.E.2d 468, 470 (2003) (citations omitted).  As we noted in Auer, "Whether a statute is wise is . . . a matter for the legislature and not for a court." 270 Va. at 177, 613 S.E.2d at 423 (citing Horner v. Dept. of Mental Health, 268 Va. 187, 193, 597 S.E.2d 202, 205 (2004)).

For these reasons, I believe the construction of Code § 8.01-581.18(B) set forth in Auer was correct and that stare decisis dictates that our decision be followed.  The majority's new construction of the statute does not comport with its plain meaning and adds language to the statute not written by the General Assembly.  If the General Assembly chooses to amend the statute it may do so, but we cannot. Therefore, I respectfully dissent from the majority opinion, and would reverse the judgment of the trial court and enter final judgment for Dr. Oraee.

32